**SO ORDERED.**

**SIGNED this 07 day of June, 2010.**

_____
**JAMES D. WALKER, JR.**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | CASE NO. 09-50194-JDW |
| JAMES FERRELL LOVVORN, JR., | ) | |
| and SANDRA DIANE LOVVORN, | ) | |
| | ) | |
| DEBTORS. | ) | |
| | ) | |
| KENNETH C. BAZEMORE and | ) | ADVERSARY PROCEEDING |
| KCB ENTERPRISES, INC., | ) | NO. 09-5046 |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| JAMES FERRELL LOVVORN, JR., | ) | |
| and SANDRA DIANE LOVVORN, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

BEFORE

JAMES D. WALKER, JR.

UNITED STATES BANKRUPTCY JUDGE

<u>COUNSEL</u>

For Debtors:         Elizabeth L. McBrearty
                     Post Office Box 839
                     Macon, Georgia 31202

For Plaintiffs:      Wesley J. Boyer
                     355 Cotton Avenue
                     Macon, Georgia 31201

**MEMORANDUM OPINION**

This matter comes before the Court on Plaintiffs' complaint to determine the dischargeability of a debt. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(I). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

**Findings of Fact**

Debtor James Lovvorn operated an auto body repair business known as Ding & Dent ("D&D"). He became acquainted with Plaintiff Kenneth Bazemore sometime prior to February 2000, when Plaintiff brought his car into D&D for repair. At that time, Plaintiff owned a commercial building and was looking for a tenant. He agreed to lease the building to D&D with a three-year option to buy. Plaintiff testified that he renovated the building to D&D's specifications, which resulted in cost overruns of $150,000. On December 15, 2002, Mr. Lovvorn and his wife, co-debtor Sandra Lovvorn, signed a promissory note in favor of Plaintiff for the $150,000. They signed as president and secretary of D&D, respectively. At the same time, Mr. and Ms. Lovvorn executed a personal guarantee for the note.

About this time, Mr. Lovvorn and Plaintiff purchased a Rhino Linings franchise, a business that provides spray-on linings for truck beds. Plaintiff borrowed $35,000 from Security Bank to make the investment. However, the business was unsuccessful. Mr. Lovvorn sold the Rhino Linings equipment and used the proceeds toward buying out Plaintiff's interest in the business.

3

D&D, on the other hand, was profitable until 2003, when Mr. Lovvorn learned it was being pursued by the Georgia Department of Revenue for unpaid sales taxes and by the Internal Revenue Service. The taxing authorities refused to discuss the tax situation with Mr. Lovvorn because, at that time, according to his testimony, he was neither an owner nor an officer of the business. Mr. Lovvorn testified that his sister-in-law had been in charge of the business and had failed to pay the taxes. In order to deal with the tax debt, Mr. and Ms. Lovvorn took control of D&D.

On August 20, 2004, Mr. Lovvorn gave Mr. Bazemore a security interest in D&D's equipment to secure the $150,000 note. The security agreement was signed by Mr. Lovvorn as president of D&D and by Ms. Lovvorn as secretary of D&D. The security agreement listed collateral as follows:

> (a) One (1) Kaeser TU26 Compressor, yr.2001, Serial #1120, Ref. 1.9014.20100; and
> (b) Paint Booth & Equipment: GARMAT Model #99273, Serial #A0301E004796; GARMAT Model #99273, Cabin #99877, Serial #4796; Listed Lights Model #101-40ES; and
> (c) One (1) Prospot Model PR-8 Welder, Serial #200130; and
> (d) Frame Machines: Star Rack 360; Car O Liner Mark IV; and Car O Liner Mark V; and
> (e) All office furnishings, fixtures, equipment, machinery, computers, computer software located at or on the business premises at 1340 Radio Loop, Warner Robins, Georgia 31088; and
> (f) All substitutes and replacements for, accessions, attachments, and other additions to, and tools, parts and equipment used in connection with any of the foregoing; and
> (g) All cash or non-cash proceeds of any of the foregoing, including insurance proceeds.

(Plaintiff's ex. 3, Security Agreement, Exhibit "A.") Mr. Lovvorn and Plaintiff both testified that

4

Plaintiff suggested the security agreement for the purposes of protecting D&D's assets against levy by the taxing authorities.

At some later time, Plaintiff wanted an additional $10,000 payment on the $150,000 note. Mr. Lovvorn agreed to pay over the proceeds from the sale of real property. However, when Mr. Lovvorn received the proceeds of $10,200, D&D was having financial problems and could not meet its payroll obligations. Mr. Lovvorn asked Plaintiff if he could use the proceeds for payroll. Plaintiff agreed if Mr. Lovvorn was willing to give him a lien on a 1970 Plymouth GTX that Mr. Lovvorn had restored. On March 31, 2005, Mr. Lovvorn pledged the car to Plaintiff to the extent of $10,200. Mr. Lovvorn testified that he understood if he ever sold the car, he was obligated to pay Plaintiff $10,200 from the proceeds of the sale.

The parties did not provide evidence of any document specifically identified as a note or a security agreement. However, Plaintiff provided an untitled document signed by Mr. Lovvorn and Plaintiff and notarized on March 31, 2005. The text of the document consists of one paragraph, and expressly addresses the proceeds of the sale of real property, stating as follows:

> The purpose of this document between Kenneth C. Bazemore and James F. Lovvorn Jr., president of Ding and Dent Inc. is to clarify where the net proceeds from the sale of the lot ... were to be applied. As agreed by both parties, instead of being used as partial payment toward the 150,000$ [sic] note between Bazemore and Ding and Dent, the proceeds (10,204$ plus 2055$ cash) provided by Bazemore will instead be loaned to James Lovvorn Jr. for a period not to exceed 60 days at 12%. On May 30, 2005 7800$ cash will be due and the remainder shall be paid within 10 days of settling the lawsuit currently being litigated by James and Sandy Lovvorn pertaining to a car accident in which they were both injured. The rate will be 12%. This loan will be personally guaranteed by James F. Lovvorn Jr. None of the 10,204$ was applied to or reduced the amount of the 150,000$ note that the lien on the lot was intended to accomplish. James F. Lovvorn Jr. has

5

>     provided a 1970 Plymouth GTX ... as collateral for this transaction
>     and personally guarantees its payment.  This loan no longer has any
>     bearing on the 150,000$ note between Bazemore, Ding and Dent,
>     and Lovvorn, but instead replaces a promissory note between Ding
>     and Dent and Bazemore that originated on August 1, 2000.[1]

(Plaintiff's ex. 6.)

In 2006, Mr. Lovvorn sold the GTX as part of a lot of four vehicles for a total of $45,000. He estimated approximately $26,000 to $28,000 of that was attributable to the GTX. Mr. Lovvorn used the proceeds to pay part of D&D's tax debt, and paid none of the proceeds to Plaintiff. Both Mr. and Ms. Lovvorn testified they decided to pay the taxing authorities in an effort to keep D&D viable as a business. The year following the sale of the GTX, on July 20, 2007, Plaintiff filed financing statements in Houston, Taylor, and Peach counties, listing collateral as "that certain 1970 Plymouth GTX, VIN RS23UOG244319, and any proceeds therefrom."[2] (Plaintiff's ex. 6.)  Plaintiff testified that he had, on several occasions, asked Mr. Lovvorn about the location of the car, and Mr. Lovvorn would offer various responses, such that it was at his father's house or at a car show. Plaintiff's attorney wrote a demand letter to Mr. Lovvorn, dated October 1, 2007–the year after the sale–that includes a request to inspect the GTX. Plaintiff also testified that he did not learn the car was sold until January 2009, when the Lovvorn's filed their bankruptcy petition. Despite this assertion, in December 2008–the month before the Lovvorns' bankruptcy filing–Plaintiff obtained a default judgment against Mr. Lovvorn in the amount of $15,000. The judgment was, according to the complaint in this

---

[1] The Court has no evidence as to the amount, subject matter, nature, or purpose of the August 1, 2000, promissory note.

[2] The GTX is an untitled vehicle due to its age and is excluded from the requirements of Georgia's Motor Vehicle Title Act. See O.C.G.A. § 40-3-4(14) (2007).

adversary proceeding, related to the transaction involving the GTX. Nothing in the evidence indicates the state court cause of action.

Due to D&D's tax problems, two auto insurance companies terminated their relationships with D&D, which resulted in a loss of more than half the company's business. D&D filed a Chapter 11 petition in January 2007. The petition listed Plaintiff as a lessor, but did not list him as a creditor in any other capacity. In April 2007, D&D stopped paying Plaintiff for the lease and the $150,000 note. D&D's bankruptcy case was dismissed in August 2007.

While the bankruptcy case was pending, Mr. Lovvorn started talking to D&D's manager, Eric Chandler, about taking over the business. Mr. Chandler took over the business in July 2007. About the time of the change in ownership, Mr. Lovvorn contacted Richard Kipp, the shop foreman for D&D, and directed him to bring Mr. Lovvorn's tools from the shop to his house. Mr. Kipp testified that the items included a toolbox, welder torches, a frame machine airjack, a plasma cutter, a shop fan, and various odds and ends.

Plaintiff claims the tools Mr. Lovvorn removed belonged to D&D and were subject to his security interest. Mr. Lovvorn claims the tools were his personal tools, some of which he had owned for more than 20 years. Mr. Lovvorn specifically addressed several of the tools at issue in his testimony as follows:

- plasma cutter: Mr. Lovvorn purchased it for himself, paying $600 to a man who had sold it because he needed money;

- media blaster: Mr. Lovvorn purchased it to restore his car; in addition, D&D employees used it from time to time to work on their personal projects;

- welder: although it did pass through the shop, Mr. Lovvorn had owned it for more than 20 years;

- air frame jack: D&D purchased it for Mr. Lovvorn's father, who reimbursed the business;

- Snap-On sander: Mr. Lovvorn had owned it for more than 10 years and kept it in his personal tool box;

- big screen computer monitor: Mr. Lovvorn had purchased it for use at home; he brought it to the shop because his eyesight was failing;

- Snap-On floor jack: Mr. Lovvorn had owned it for many years; D&D owned a separate floor jack that remained at the shop;

- fold-up engine hoist: Mr. Lovvorn owned it personally, although he had kept it at the shop; he bought a new engine stand that stayed with the shop when Mr. Chandler took over;

- Snap-On glass beading cabinet: Mr. Lovvorn either purchased it himself or repaid D&D for the purchase price;

- Quick Stick: D&D paid for it in 2002 and was reimbursed by Mr. Lovvorn's father; it was kept at D&D for a few months immediately after its purchase, but has otherwise been in the possession of Mr. Lovvorn's father;

- car trailer: D&D purchased it and gave it to Mr. Lovvorn in lieu of a bonus in November 2002.

Plaintiff submitted as evidence an account statement showing tools purchased from Snap-On by D&D. The tools were identified by product number. A general description of each item (e.g., "socket," "valve," welder") was handwritten next to each entry. The only item on the statement Plaintiff associated with equipment taken from D&D by Mr. Lovvorn was the glass beading cabinet. In addition, Plaintiff produced a receipt showing D&D purchased the Quick Stick from a different supplier. However, Plaintiff offered no other evidence to contradict Mr. Lovvorn's explanations about the ownership of those two items.

Mr. Chandler testified that when he began operating the business in July 2007, nearly all the necessary tools and equipment he needed to run the business were still on the premises. He

only had to buy a welder. In addition, at that time, he began paying Plaintiff to lease the facilities and for equipment rental.[3] Mr. Lovvorn testified he believed Mr. Chandler would assume all the debt related to the business. Neither Mr. Chandler nor Plaintiff testified about whether Mr. Chandler was expected to assume the debt remaining on the $150,000 note.

Mr. and Ms. Lovvorn filed a joint Chapter 7 petition on January 22, 2009. They listed Plaintiff as an unsecured creditor for the $15,000 judgment he obtained against Mr. Lovvorn. Plaintiff filed a complaint alleging his debt was nondischargeable under § 523(a)(2), (a)(4), and (a)(6). In addition, the complaint alleged that Mr. and Ms. Lovvorn owed Plaintiff $30,000 for unpaid lease obligations; $128,000 under the promissory note; $15,000 for the judgment debt; and $23,500 for the debt related to Rhino Linings. The Court held a trial on the complaint on March 31, 2010. Based on the evidence and legal arguments presented at trial, the Court will enter judgment for Debtor-Defendants, Mr. and Ms. Lovvorn.

### Conclusions of Law

At issue in this case is whether or not the Lovvorns' debts to Plaintiff are excepted from discharge. In light of bankruptcy's purpose to provide honest debtors with a fresh start, courts construe exceptions to discharge liberally in favor of the debtor. Hope v. Walker (In re Walker), 48 F.3d 1161, 1664-65 (11th Cir. 1995). The creditor bears the burden to prove nondischargeability by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 287, 112 S. Ct. 654, 659 (1991).

---

[3] It is not clear when Plaintiff took ownership of the equipment, but he testified that he reduced the amount due on the $150,000 note by the value of the equipment. He also testified that Mr. Chandler was paying to purchase the equipment, not to rent it.

9

Section 523(a) provides in relevant part as follows:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt–
> ...
>> (2) for money, property, services, or an extension, renewal, or refinancing credit, to the extent obtained, by–
>> (A) false pretenses, a false representation, or actual fraud ...;
> ...
>> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
> ...
>> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. § 523(a).

### Fraud

To prove fraud for purposes of § 523(a)(2), Plaintiff must establish "(1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation." SEC v. Bilzerian (In re Bilzerian), 153 F.3d 1278, 1281 (11th Cir. 1998) (citing Field v. Mans, 516 U.S. 59, 73-75, 116 S. Ct. 437, 445-46 (1995)).

Plaintiff never specifically identified the representation or representations that serve as the basis of his fraud claim. In reviewing the complaint, the Court found only one allegation suggestive of misrepresentation or fraud: Plaintiff alleged that Mr. Lovvorn gave him a security interest in a paint booth and represented that he would have first priority, even though Mr. Lovvorn had already given a first lien in the booth to a different creditor. During opening statements, Plaintiff's counsel raised the issue of the paint booth but indicated that Plaintiff's UCC was filed before the other creditor. The paint booth was not the subject of testimony. After

combing through the documents submitted by Plaintiff, the Court concludes Plaintiff took a security interest in the paint booth on August 30, 2004, in connection with the $150,000 promissory note, but did not perfect it at that time. (Plaintiff's ex. 3.) Security Bank of Houston County filed a financing statement, perfecting a security interest in the same paint booth more than six months later on March 9, 2005. (Plaintiff's ex. 9.) Approximately two weeks later, Plaintiff filed a financing statement to perfect his security interest in the paint booth, which put his lien in second position behind Security Bank.[4] (Plaintiff's ex. 4.)

None of this evidence demonstrates a false representation made by Mr. or Ms. Lovvorn. On the contrary, it shows Plaintiff could have had a first priority lien if he had acted in a timely manner to perfect his security interest in the paint booth. Because Plaintiff has failed to establish a false representation by Mr. or Ms. Lovvorn, his debt is not excepted from discharge under § 523(a)(2).

Larceny

To prove larceny under § 523(a)(4), Plaintiff must show "a felonious taking of property with the intent to convert it or to permanently deprive the owner of it." Bennett v. Wright (In re Wright), 282 B.R. 510, 516 (Bankr. M.D. Ga. 2002) (Walker, J.) (citing Southern Concrete Constr. Co. v. Lennard (In re Lennard), 245 B.R. 428, 433 (Bankr. M.D. Ga. 1999)). In this case, Plaintiff alleges Mr. Lovvorn committed larceny when he directed an employee of D&D to bring him certain tools from the shop. However, Plaintiff's claim fails for two reasons. First, Plaintiff

---

[4] The date on the financing statement is not fully legible. It appears to be March 25, March 26, or March 28, 2005.

11

conceded he did not own any of the tools removed by Mr. Lovvorn. In fact, Mr. Lovvorn provided unrefuted testimony that he personally owned the tools he removed. Thus, there was no taking of property–felonious or otherwise. Second, § 523(a)(4) excepts from discharge debts "for ... larceny." In this case, the debts to Plaintiff pre-existed the removal of the tools and were consequently unrelated to the alleged larceny. Therefore, even if Plaintiff could prove larceny, the discharge exception would not apply to his debts.

Willful and Malicious Injury

To succeed under § 523(a)(6), Plaintiff must prove an injury that was inflicted both willfully and with malice. A debtor acts willfully when he has specific intent to inflict the injury or if he knew with substantial certainty that the injury would result from his actions. <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61, 118 S. Ct. 974, 977 (1998); <u>Ford Motor Credit Co. v. Moody</u> (<u>In re Moody</u>), 277 B.R. 865, 870 (Bankr. S.D. Ga. 2001) (Walker, J.). A debtor acts maliciously when the injury is "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." <u>Hope v. Walker</u> (<u>In reWalker</u>), 48 F.3d 1161, 1164 (11th Cir. 1995) (citations and internal quotation marks omitted). Depending on the circumstances and the course of dealings between the parties, a conversion of collateral or proceeds of collateral may be willful and malicious. <u>Wolfson v. Equine Capital Corp.</u> (<u>In re Wolfson</u>), 56 F.3d 52, 54 (11th Cir. 1995).

Plaintiff argues that Mr. Lovvorn converted Plaintiff's collateral to his own use. Plaintiff claimed a security interest in all D&D's equipment–including equipment removed from the business at Mr. Lovvorn's direction. Plaintiff also claimed a security interest in Mr. Lovvorn's

Pontiac GTX. When Mr. Lovvorn sold the GTX, he remitted the proceeds to the IRS and paid nothing to Plaintiff. With respect to the equipment, the Court is persuaded by Mr. Lovvorn's testimony that the equipment removed by him belonged to him rather than to D&D. Therefore, it was not subject to Plaintiff's security interest and cannot be the basis of a § 523(a)(6) claim. The only remaining issue is whether or not Mr. Lovvorn's conduct with respect to the GTX amounted to willful and malicious injury.

A considerable body of law addresses the general fact pattern of a debtor who sells a creditor's collateral without paying the creditor. For example, the Eleventh Circuit Court of Appeals addressed the issue in Ford Motor Credit Co. v. Owens, 807 F.2d 1556 (11th Cir. 1987). Ford Motor Credit had provided floor plan financing for the debtor's business, which was an auto dealership. Pursuant to the financing agreement, the dealership was required to hold the proceeds from the sale of vehicles in trust for the creditor. The dealership sold several vehicles with a total value of approximately $97,000 and failed to remit the proceeds to the creditor. Id. at 1559. The court held that the sale out of trust constituted willful and malicious injury because the dealership "did not have any good faith reason for doing so and ... it presumptively knew that harm would result from conversion of a secured party's collateral." Id. In reaching its conclusion, the court pointed to the existence of the trust provision in the financing agreement, but it provided no specific analysis as to either the willful or the malicious prong of § 523(a)(6). Id.

More recently, the circuit court decided Wolfson, in which the debtor co-owned a horse farm and pledged the horses as collateral to its primary creditor for various loans. For approximately two years, the debtor deposited proceeds from the sale of collateral into its

operating account and paid what it could to the creditor, with any shortfalls in the amount due being rolled back into the principal. The creditor was fully aware of this practice. 56 F.3d at 53. When the debtor filed for bankruptcy, the bankruptcy and district courts concluded his debt to the creditor was excepted from discharge as a willful and malicious injury. Id. at 54. The circuit court disagreed. It noted that the conversion of collateral was not willful and malicious because the creditor knew about and acquiesced to the debtor's routine practice of retaining proceeds of the collateral. Id. The court then went a step further, concluding that it did not even need to reach the willful and malicious question because the creditor had waived its right to bring a § 523(a)(6) action by taking no steps to protect its security interest despite its knowledge of the debtor's conduct. Id. at 54-55.

In addition to the Eleventh Circuit precedent, I have had occasion to consider whether conversion of collateral amounted to willful and malicious injury in three prior cases: Rentrak Corp. v. Cady (In re Cady), 195 B.R. 960 (Bankr. S.D. Ga. 1996) (Walker, J.); Ford Motor Credit Co. v. Moody (In re Moody), 277 B.R. 865 (Bankr. S.D. Ga. 2001) (Walker, J.); Citizens Bank v. Wright (In re Wright), 299 B.R. 648 (Bankr. M.D. Ga. 2003).

In Cady, the debtor briefly owned a video rental store. The creditor, who was a video supplier, owned some of the videos available for rent and sale at the debtor's store. Thus, the case did not specifically deal with conversion of collateral; rather conversion of the creditor's property. The debtor was required to remit to the creditor a portion of the proceeds of the sale or rental of the videos, which he failed to do. However the creditor was only one of multiple suppliers. The agreement between the parties did not require segregation of the creditor's funds. Instead, all money generated by the business was deposited into a general operating account. 195

B.R. at 962-63. The court noted the conversion of property was not the focus of its inquiry; rather it was concerned with the use of the proceeds. Id. at 967. The court found no intent to injure the creditor because the debtor was using the proceeds to keep the business afloat. Id. at 968. Nor was the injury substantially certain to result because the agreement between the parties provided for the use of proceeds for operating the business. Id. Furthermore, as in Wolfson, the creditor "acquiesced to Debtor's use of the proceeds of the sale and lease of the property" and did not "exercise the options it had to protect itself from the damage caused by Debtor's ... conversion." Id. at 969.

Moody and Wright both arose in the context of floorplan financing for an auto dealership and a manufactured home dealership, respectively. In Moody the debtor had little involvement in the operation of the dealership, instead delegating responsibility to a manager who had been approved by the creditor. Furthermore, the financing agreement did not require segregation of the proceeds of collateral, and the creditor was aware the dealership commingled the proceeds with operating funds. 277 B.R. at 867. The Court was persuaded that the debtor's limited involvement in the operations and the terms of the financing agreement distinguished the case from Owens and concluded the debtor did not act willfully. Id. at 870-71. Thus, the debt was dischargeable. Id. at 871.

Wright presented substantially different facts that led to the same result. The debtor was directly involved with the management of the dealership, was directly involved in making out-of-trust sales, and was directly involved in efforts to conceal those sales from the creditor. 299 B.R. at 651-56. Nevertheless, the Court again found no willful and malicious injury. As in Wolfson, the financing agreement did not require the dealership to remit the proceeds of the sale to the

creditor.  Id. at 662.  In addition, the dealership was current on its obligations to the creditor even though it was out of trust.  Id.  After evaluating the case law, the Court determined a willful and malicious injury does not arise from a debtor's use of proceeds of collateral "to pay ordinary business expenses in an effort to keep their businesses afloat" and further concluded "Section 523(a)(6) is not intended to be a source of commercial recourse in ordinary debtor-creditor disputes."  Id.

In contrast to this Court's decisions, some judges offer a much broader reading of willful and malicious injury in the context of conversion of collateral.  For example, in Ocean Equity Group v. Wooten (In re Wooten), 423 B.R. 108 (Bankr. E.D. Va. 2010), the court considered the debtor's intent to pay a secured creditor notwithstanding the conversion of collateral to be irrelevant.  Instead, the proper inquiry is "'whether the debtor intended to improperly use the creditor's collateral and/or its proceeds for purposes other than the payment of the debt that property secured.  If so, there is an intentional injury.'"  Id. at 133 (quoting ABF, Inc. v. Russell (In re Russell), 262 B.R. 449, 454-55 (Bankr. N.D. Ind. 2001)).  Under such a sweeping definition, most, if not all, conversions of collateral or proceeds of collateral are willful, as shown in the "common Midwestern scenario" described by the court in Calumet v. Whiters (In re Whiters), 337 B.R. 326, 349 (Bankr. N.D. Ind. 2006).

> [T]he farmer who sells the pigs that he knows are subject to Sixth
> Fourth Bank's security interest for his crop loan to buy food for his
> family–without clearing the sale with the bank–and buys food for
> his family instead of remitting the proceeds to the bank–acts
> "wilfully" [sic] because he intentionally deprived the bank of its
> right to control the proceeds from the disposition of its collateral.

Id. at 349-50.[5]

The Wooten construction of willfulness would leave most conversion of collateral cases to be decided on the issue of malice. In this context, malice may be established by proving the debtor knew of the creditor's rights with respect to the collateral and violated those rights. Wooten, 423 B.R. at 134 (citations omitted); see also Lampi v. Hundman Lumber Mart Co., Inc. (In re Lampi), 152 B.R. 543 (C.D. Ill. 1993) ( "[I]f the debtors know their conduct may cause financial injury, then they acted maliciously."); New Buffalo Savings Bank v. McClung (In re McClung), 335 B.R. 466, 475 (Bankr. M.D. Fla. 2005) ("There must be a consciousness of wrongdoing."). Nevertheless, the court must consider all the facts including any exigent or mitigating circumstances in reaching a decision about malice. Wooten, 423 B.R. at 134; McClung, 335 B.R. at 475 (finding a lack of malice when a debtor who was in denial about his financial situation liquidated a secured creditor's collateral and used the proceeds to "maintain[] his lifestyle and marital harmony...").

The Court is not persuaded the rule set forth in Wooten and other cases provides the best means for analyzing a § 523(a)(6) claim in the context of conversion of collateral. Instead, the Court relies on its prior decisions which emphasize the terms of the agreement and the debtor's reason for misuse of the proceeds of collateral, while also considering the actions of the creditor.

---

[5] Interestingly, the court in Whiters found no willfulness. 337 B.R. at 355. The collateral at issue was a car, which the debtor had refinanced. The original creditor sent the title to the debtor, who never turned it over to the new creditor. Several months after the refinancing, the car needed repairs. A mechanic agreed to make the repairs, but claimed he would need the title to do so. The debtor naively handed over the car and the title. In addition, the debtor offered some evidence that the mechanic agreed to purchase the car and pay off the secured creditor. Although the mechanic apparently repaired the car, he neither returned it to the debtor nor paid for it. Instead, he absconded with the car, never to be heard from again. Id. at 353.

This case presents a harder call than the Court's prior cases on conversion of collateral, primarily due to the unusual nature of the debt. The Lovvorns owed Plaintiff $150,000 for cost overruns on the building D&D leased from Plaintiff. Based on the testimony, they were making all the payments on that note in a timely manner.[6] Nevertheless, Plaintiff demanded an additional payment of $10,000. Plaintiff withdrew his demand for payment in exchange for a security interest in the GTX.[7] As a result, the parties entered into an arrangement whereby Mr. Lovvorn apparently agreed to repay money that was never actually loaned by Plaintiff.[8] The terms of the agreement provided for repayment in two lump sums–the first of which was to be paid within 60 days of the agreement. It made no mention of proceeds from the sale of collateral.

The Lovvorns testified that their primary concern when directing payments to the IRS was to keep D&D operating. This is similar to the debtor in <u>Wright</u> using proceeds of collateral to save his business. 299 B.R. at 661. The Lovvorns made no attempt to hide the tax problems from Plaintiff. In fact, their financial maneuverings worked to Plaintiff's benefit. The Lovvorns were able to keep D&D afloat for an additional two years, and were able to continue making payments to Plaintiff on the $150,000 note until April 2007. These facts alone persuade the

---

[6] Plaintiff testified that they did not miss any payments until April 2007.

[7] This raises some question about the enforceability of Plaintiff's security interest. Under Georgia law, a security interest does not attach to collateral unless, among other things, "[v]alue has been given[.]" O.C.G.A. § 11-9-203(b)(1) (2002). If, as it appears, the Lovvorns were current on their loan payments then they were under no legal or contractual obligation to make the extra payment demanded by Plaintiff. Thus, foregoing a payment to which he is not entitled is unlikely to constitute forbearance or any other sort of value given on the part of Plaintiff. However, the security agreement also mentions $2,055 in cash, which was not explained by the parties, and may serve as the basis for value.

[8] According to the security agreement, "None of the 10,204$ was applied to or reduced the amount of the 150,000$ note ...." (Plaintiff's ex. 6.)

Court that the Lovvorns did not intend to injure Plaintiff and that injury was not substantially certain to result from their actions. Thus, Plaintiff has failed to prove the willful prong of § 523(a)(6).

Plaintiff's conduct further supports the Court's conclusion. Although Mr. Lovvorn failed to make the first lump sum payment due under the GTX note in May 2005, Plaintiff continued doing business with the Lovvorns and D&D for two more years. While he made some inquiries about inspecting the GTX, there is no evidence that he took any steps to repossess it. Furthermore, he failed to take the most basic step to protect his interest in the collateral–he did not perfect his security interest until July 2007. The perfection coincided with the cessation of payments on the $150,000 note, the failure of D&D's bankruptcy case, and the take over of D&D by Mr. Chandler. In other words, Plaintiff did little more than grumble about the GTX transaction so long as he was receiving regular payments on the larger debt (the $150,000 note). He only took action to protect his collateral once D&D reached a tipping point and was apparently beyond saving.

**Conclusion**

Plaintiff in this case alleged nondischargeability under § 523(a)(2), (a)(4), and (a)(6). With respect to fraud under subsection (a)(2), Plaintiff failed to prove the Lovvorns made any misrepresentations. With respect to larceny under subsection (a)(4), Plaintiff failed to prove a taking of his property and failed to prove his debt resulted from such a taking. With respect to willful and malicious injury under subsection (a)(6), Plaintiff failed to prove the Lovvorns intended to injure him or that injury was substantially certain to result when they disposed of his

19

collateral and remitted the proceeds to the IRS.  Therefore, the Court will enter judgment for Debtor-Defendants James and Sandra Lovvorn.

An Order in accordance with this Opinion will be entered on this date.

END OF DOCUMENT